# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| GREAT NORTHERN INS. CO., | Case No. 3:08-cv-382 |
| Plaintiff, | Judge Timothy S. Black |
| vs. | |
| H.J. OSTERFELD CO., *et al.*, | |
| Defendants, | |
| vs. | |
| KETTERING TOWER PARTNERS, LLC, *et al.*, | |
| Third-Party Defendants. | |

## ORDER THAT THIRD-PARTY DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (Doc. 103) IS GRANTED

This civil action is before the Court on Third-Party Defendant U.S. Security Associates ("USSA")'s motion for summary judgment (Doc. 103) and the parties' responsive memoranda (Docs. 106, 112, 115, 117).[1]

## I. BACKGROUND

USSA moves the Court to enter summary judgment in its favor on the amended third-party complaint of Third-Party Plaintiffs S&D Osterfeld Mechanical Contractors, Inc. ("S&D"), Osterfeld Champion Service, Inc. ("Champion"), and Korrect Plumbing, Inc. ("Korrect").

---

[1] Plaintiff's claims have been settled. The only claims remaining in this case are those asserted by Defendants/Third-Party Plaintiffs against Third-Party Defendant USSA.

This case arises out of a flood and fire that occurred on October 26, 2006, at the Kettering Tower, a high rise located in Dayton, Ohio. Plaintiff, Great Northern Ins. Co. ("Great Northern"), seeks subrogation for amounts it paid to its insured, the Kettering Tower Partners LLC ("Partners"), for damages and repairs resulting from the flood and fire. Plaintiff initially named three Defendants, S&D, Champion, and Korrect (collectively, the "plumbing Defendants"), all of whom allegedly performed plumbing services at the Kettering Tower in the years and months leading up to the incident. The plumbing Defendants, in turn, filed Third-Party Complaints against a number of Third-Party Defendants, including, the owners of the building, Partners; the property management company, Neyer Commercial Realty, LLC and Neyer Real Estate Management (collectively, "Neyer"); an engineering firm, Helmig Lienesch, LLC and Helmig Lienesch & Associates (collectively "Helmig"); and the security guard company, USSA, for indemnification and contribution. The basis of the Third-Party Complaint against USSA is that if the plumbing Defendants are found liable to Plaintiff, USSA is liable for all or part of the damages.

USSA was the security guard hired to patrol the Kettering Tower and report to Neyer for all maintenance and repair issues. USSA claims that it cannot be held liable for indemnification and/or contribution because it had no express or implied agreements with the plumbing Defendants. Further, USSA claims that it did not have a "special relationship" with the plumbing Defendants sufficient to give rise to implied indemnification and that it was not a "joint tortfeasor," for purposes of the contribution claim.

## II.     UNDISPUTED FACTS [2]

1. Plaintiff Great Northern, insurer of Partners, seeks subrogation of amounts paid to repair parts of the Kettering Tower, a high rise building owned by Partners and located at 40 North Main, Dayton, Ohio, as a result of a flood and fire.

2. A backflow preventer was installed on the 30th floor of the Kettering Tower which purportedly failed and discharged significant amounts of water.[3]

3. Great Northern brought suit against S&D, Champion, and Korrect (the "plumbing Defendants"), all of whom allegedly performed plumbing services at the Kettering Tower in the years and months leading up to the flood and fire.

4. Thereafter, the plumbing Defendants filed various Third-Party Complaints against a number of Third-Party Defendants, including USSA, for indemnification and/or contribution. (Docs. 57, 61, 63).

5. S&D is a plumbing company organized and existing under the laws of the State of Ohio. (Doc. 57 at ¶ 1).

6. S&D has extensive experience in performing plumbing and maintenance services. (Doc. 103, Ex. 1 at 17, 102). Mr. Beasley started his "indenture" in 1954 and remains employed by S&D. (*Id.* at 102).

7. As a plumbing company, S&D's employees are trained in plumbing and HVAC services. (*Id.* at 16-18).

8. S&D's employees maintain plumbing, HVAC, refrigeration and boiler licenses. (*Id.* at 16).

9. S&D provided plumbing services at the Kettering Tower during the years and months prior to October 2006. (*Id.* at 23-24, 27, 30-31, 39, 54, 59-60, 62-

---

[2] *See* Docs. 104 and 106, Ex. 1.

[3] Champion denies that the incident began on October 26, 2006, and instead claims that it began on October 25, 2006 at approximately 11:30 p.m. (Doc. 114 at 136, 139-140, Ex. B; Doc. 108 at 41). Additionally, Champion claims the water was able to make its way into the electrical bus duct from the 29th floor, but a fire erupted on the 23rd floor. (Doc. 113 at 191-192, 237).

63, 68-70, 74-75, 82- 83, 93, 99-101, 119-20).

10. At some point prior to the fire, S&D recertified the backflow preventer installed on the 30th floor. (*Id.* at 60, 108, 121).

11. S&D did not have a written or implied agreement with USSA. (*Id.* at 125).

12. S&D representative, Mr. Beasley, had never heard of USSA and did not know USSA's role or responsibilities at the Kettering Tower. (*Id.*)

13. The only "contact" USSA may have had with S&D was to "unlock the door" for S&D to do plumbing work. (Doc. 114 at 151).

14. Champion is a plumbing company organized and existing under the laws of the State of Ohio. (Doc. 18 at ¶ 1).

15. Champion is a competitor of S&D and other plumbing entities. (Doc. 103, Ex. 1 at 57).[4]

20. Champion's foreman, Mr. Pennington, testified that he had not involved security personnel in his plumbing work or asked them to assist him in the work that he completed at the Kettering Tower. (Doc. 109 at 109).

21. Korrect is a plumbing company organized and existing under the laws of Ohio. (Doc. 61 at ¶ 1).

22. Like S&D and Champion, Korrect's employees are trained in plumbing work, including, the certification of backflow preventers. (Doc. 111 at 8-10) (Mr. Landis was employed by Korrect as a plumber for 52 years before retiring in 2009); Doc. 103, Ex. 6 at 8-9 (Mr. Riley has been employed by Korrect for 26 years and is currently a journeyman plumber); Doc. 103, Ex.

---

[4] USSA claims that Champion's employees are trained in plumbing and HVAC services and that their plumbers take specialized courses in subjects such as backflow certification. Champion denies that there is any evidence regarding the training received by its employees. Additionally, Champion claims that there was no evidence that its employees were licensed or certified in backflow. Additionally, Champion claims that it did not perform any services on the subject backflow preventers in the months leading up to the incident and had last worked on the backflow preventers in June 2005. Moreover, Champion claims it did not install the plumbing system in the Kettering Tower. H.J. Osterfeld installed the plumbing system in Kettering Tower. (Doc. 113 at 62-63 and 255).

-4-

7 at 10-11 (Mr. Sutter has been employed by Korrect for over 23 years as an apprentice, journeyman, and master plumber and, currently, as an estimator).

23. Korrect began performing plumbing work at the Kettering Tower in 2005, when John Hoyer took over as Property Manager for Neyer. (Doc 113 at 103-105).

24. Korrect recertified the backflow preventer.[5]

25. After the incident, Korrect disassembled the faulty backflow preventer and investigated the alleged failure. (Doc. 103, Ex. 6 at 11; Ex. 7 at 66-70; Ex. 8 at 112).

26. Korrect had no agreement or other relationship with USSA. (Doc. 103, Ex. 5 at 26; Ex. 6 at 38; Ex. 7 at 114).

27. USSA never dealt with Korrect as part of its duties. (Doc. 110 at 107). Korrect plumbers were unaware of any situations in which a USSA security guard would inspect or otherwise be responsible for plumbing work. (Doc. 111 at 26; Doc. 103, Ex. 6 at 38; Ex. 7 at 114-15).

28. USSA provides security guard services to various companies and organizations throughout the United States.

29. Mr. Charles Melson has been employed with USSA for 11 years and is the current Security Supervisor. (Doc. 114 at 8).

30. Mr. Bobby Edwards was employed as a security guard for USSA at the Kettering Tower for approximately seven years. (Doc. 110 at 10).

31. For a number of years prior to October 2006, USSA had an agreement with Partners to provide security guard services at the Kettering Tower. (Doc. 114 at 18-19).

32. USSA worked closely with Partners and Neyer. In October 2006, USSA reported directly to Neyer. (*Id.* at 9).

---

[5] Champion claims that it was recertified in May 2006, and USSA claims it was recertified in March 2006.

33. A USSA security guard's job duties include conducting safety rounds, directing visitors, and unlocking units for tenants and contractors. (*Id.* at 8-9, 26-27; Doc. 110 at 12).

34. Two USSA guards worked every shift, three shifts in total. (Doc. 114 at 21, 31; Doc. 110 at 16). One of the guards monitored the front desk while another guard made rounds, as specified by Neyer, throughout the building. (Doc. 114 at 31-32, 99-100; Doc. 110 at 16, 48).

35. The rounds were verified by various "hit points" throughout the building. (Doc. 114 at 34; Doc. 110 at 18). The guard recorded the round using an electronic wand system at each "hit point." (Doc. 114 at 34-35; Doc. 110 at 18). The "hit point" records were sent directly to Neyer for review and approval. (Doc. 114 at 59).[6]

38. If the maintenance and/or repair issue was complicated, Neyer would contact a contractor to perform maintenance and repairs as necessary. (Doc. 113 at 28, 30; Doc. 103, Ex. 8 at 44).

39. For plumbing work, Neyer contacted S&D, Champion, and/or Korrect. (Doc. 113 at 28; Doc. 103, Ex. 8 at 96).

40. USSA security guards are not trained in engineering, electrical, plumbing, or HVAC. (Doc. 114 at 48-49, 82; Doc. 110 at 12, 73).

41. The guards do not have the qualifications, nor were they hired to provide plumbing services to Kettering Tower. (Doc. 114 at 48-49).

42. The USSA security guards had no responsibility or involvement with the installation, maintenance, inspection, certification and/or recertification of backflow preventers at the Kettering Tower. The USSA guards are not trained to make specific observations of the plumbing equipment or to

---

[6] USSA alleges that if one of its guards discovered a maintenance or repair issue they were instructed to contact Neyer's maintenance personnel and that Neyer had trained personnel who were available for maintenance and repair issues at Kettering Tower. Champion denies these facts and claims that if the repair constituted a major emergency, the USSA guards were required to contact the Dayton Police and/or the Dayton Fire Department, and that although Neyer had maintenance personnel in their employ, the personnel were not trained with regard to plumbing matters nor were they on duty 24 hours a day. (Doc. 108 at 28-29; Doc. 113 at 28-44, 252).

otherwise determine if the equipment is working properly. (*Id.* at 156; Doc. 110 at 73).[7]

43. Mr. Melson testified that he is not familiar with the plumbing system "at all," nor is he familiar with the plumbing devices located on the 30th floor. (Doc. 114 at 49).

44. Mr. Edwards testified that he is unfamiliar with backflow preventers and has no knowledge regarding the plumbing system. (Doc. 110 at 12, 66-67, 73). He further testified that he never had any contact with the plumbing contractors. (*Id.* at 72-73).

45. On the night of October 25, 2006, and into the morning of October 26, 2006, two USSA security guards, Jennifer Herring and Bobby Edwards, were working the third shift. (*Id.* at 20, 25-26).

46. It was reported that water was observed leaking onto the freight elevator and that Jim Jobson of Neyer maintenance was notified. (Doc. 108 at 42;

Doc. 114 at 44, 60-61, 162; Doc. 110 at 31, 101,120).[8]

---

[7] Champion admits the statement but alleges that the USSA guards were trained to: (1) check the electrical closets on every floor of the Kettering Tower when rounds were being made (Doc. 114 at 92); (2) "make a conscious effort to provide special attention to" problem areas such as "fire exits, boiler room, lobby areas, hallways and garage" because those areas would typically have more leaks than any other part of the building (*Id.* at 102-103); (3) be alert for spills and other safety and fire hazards (*Id.* at 104); and (4) be alert during their patrol, because if they were not alert during the patrol, they were probably not doing their job and were personally at risk. (*Id.* at 105). As explained by Mr. Melson, these instructions meant that "if you were ignoring a situation that could lead to a fire, then you would be in the building when that fire happened." (*Id.* at 106).

[8] Mr. Jobson went to the first floor of the building and opened the shaft for the freight elevator and saw the stream of water coming into the shaft. (Doc. 108 at 43-44). USSA claims that Jobson immediately notified Tom Conaway, Neyer's Superintendent of Maintenance and that he and Conaway worked to repair the leak. (Doc. 114 at 39, 47-48; Doc. 110 at 31, 52-53, 85, 102; Doc. 113 at 179; Doc. 103, Ex. 8 at 63). Champion, however, claims that there is no evidence Jobson immediately notified Conaway after seeing the water. Jobson testified that he

50. Mr. Jobson proceeded to the thirtieth floor – unaccompanied by the USSA guards – and discovered that the backflow preventer was the source of the leak. (Doc. 108 at 48-49, 52; Doc. 113 at 188).

51. Mr. Jobson shut off the valves and the flow of water stopped. (Doc. 108 at 52-53; Doc. 113 at 188; Doc. 103, Ex. 8 at 70).

52. Mr. Jobson noticed that water had infiltrated electrical closets on certain floors. (Doc. 108 at 55, 57, 59-60; Doc. 113 at 191-93).

53. Mr. Jobson also noticed water on some of the electrical equipment, which he took efforts to dry. (Doc. 108 at 60, 62; Doc. 113 at 193, 196).[9]

54. The USSA guards did not attempt to repair the leak. (Doc. 108 at 56; Doc. 114 at 47; Doc. 110 at 33).[10]

56.[11] When the fire department arrived, Mr. Edwards "propped the doors open

---

believed he called Conaway after he saw the water in the freight elevator, but didn't know what time it was. (Doc. 108 at 45, 48). Additionally Jobson testified that Conaway was not with him when he turned off the water valve to the backflow preventer and no "repair" was needed to stop the flow of water. (*Id.* at 55).

[9] Additionally, Champion claims that Mr. Jobson testified that he knew that water and electricity did not mix and was concerned because there was water on a 5,000 amp bus duct. (Doc. 108 at 60). Consequently, he set up fans in the various electrical closets beginning at the 28th floor. (*Id.* at 62).

[10] Additionally, USSA claims that the guards did not travel to the upper floors of the building, but instead notified Neyer's maintenance personnel as instructed. Champion denies this fact, claiming that the guard round records indicate that there was a USSA guard on the 30th floor of the Kettering Tower at approximately 11:39 p.m. (Doc. 114 at 136, Ex. F). Additionally, Champion claims the USSA Post Orders instructed the guards to first notify the Dayton Fire Department in the event of a major emergency. Charles Melson testified that the water pouring into the freight elevator constituted a major emergency. (*Id.* at 81-82). However, the USSA guards never notified the Dayton Fire Department of the major emergency underway at the Kettering Tower. (Doc. 110 at 45-47).

[11] USSA claims that a fire alarm sounded "shortly thereafter" from smoke detected from an electrical closet on the 23rd floor and the fire department was alerted. (Doc. 114 at 39, 54-56; Doc. 110 at 46; Doc. 113 at 198; Doc. 103, Ex. 8 at 75). Champion denies this claim and alleges that the evidence indicates that the fire alarm did not sound until nearly two hours after the water was originally seen pouring into the freight elevator. (Doc. 114 at 136, 139, 140). Furthermore,

and [the fire department] went up the steps." (Doc. 110 at 52).[12]

57. At Neyer's request, USSA later prepared an Incident Report, submitted it to Neyer, and had no other involvement with the incident. (Doc. 103, Ex. 8 at 64-66; Doc. 114 at 49, 61; Doc. 110 at 108).[13]

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec.*

---

the water was seen while Jim Jobson was still in the building and his shift ended between 11:00 p.m. and midnight. (Doc. 108 at 24, 41). Jobson did not know how long it was before the fire alarm sounded and he testified that the fire department was alerted by the automatic alarm when the fire started, not a telephone call. (*Id.* at 63). Additionally, Conaway did not remember when he arrived at the Kettering Tower or how long it took before the fire alarm went off, but it took him between 30 and 45 minutes to arrive at the building after he was first called by Jim Jobson. (Doc. 113 at 185).

[12] Champion admits this fact and adds that Mr. Edwards testified that he did not go up the stairs to assist because he was "too old." (Doc. 110 at 51-52).

[13] Champion admits this point and adds that USSA prepared an incident report signed by Jennifer Herring regarding the events of October 25 and 26, 2006. However, the preparation of an incident report was required by USSA when anything out of the ordinary occurred or when there was building damage, which is precisely what happened in October 2006. (Doc. 114 at 24-25; 60-61). Neyer did not request that the report be prepared, but they requested a copy. (Doc. 103, Ex. 8 at 66).

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

Plumbing Defendants allege that USSA is responsible in tort for negligently failing to take action to avoid the foreseeable damage and harm that ultimately resulted at the Kettering Tower from the water that migrated from the 30th floor through the building's electrical system, sparking the fire.[14] As a result, plumbing Defendants claim they are joint tortfeasors with USSA and are entitled to contribution for their negligence.

The right of contribution is addressed statutorily under Ohio Rev. Code § 2307.25. Specifically, Section 2307.25 (A) provides, "if one or more persons are jointly and severally liable *in tort* for the same injury or loss to person or property . . . there may be a right of contribution even though judgment has not been recovered against all or any of them." (Emphasis added). However, where one of the alleged tortfeasors commits a breach of contract, that breach does not satisfy the statutory requirements for contribution. *Hoffman v. Fraser*, No. 2010-G-2975, 2011 Ohio App. LEXIS 1886, at ¶ 64 (Ohio App.

---

[14] Specifically, Mr. Edwards conceded that he anticipated that injury and damage would result from the amount of water coming into the freight elevator when he testified that the fire department would surely have to come and intervene – all while knowing that the cleaning crew was somewhere in the building. (Doc. 110 at 114, 121). However, neither he nor Jennifer Herring did anything to alert the Dayton Fire Department, and Mr. Edwards did nothing to clear the cleaning personnel from the building prior to the fire department being called to the scene. (*Id.* at 47-47, 121).

May 6, 2011).[15]

Contribution is the right to recover from another who is also liable for the proportionate share of that joint tortfeaser's liability. *Nevins v. Ohio Dept. of Trans.*, 724 N.E.2d 433, 446 (Ohio App. 1998). Essentially, the party which is compelled to pay more than its share of a "common burden or obligation" where several parties are liable, is entitled to contribution against the others for payment of their share. *Pennsylvania Gen. Ins. Co. v. Park-Ohio Ind., Inc.*, 2008-Ohio-5991, at ¶ 21 (Ohio App. Nov. 20, 2008). "In Ohio, a breach of contract does not create a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio App. 1996). As a general rule, "the existence of a contract action . . . excludes the opportunity to present the same case as a tort claim." *Id.* at 151. In fact, "[a] tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Id.* at 149. "If the law did not impose an 'independent and separate duty' rule . . . then every breach of contract would give rise to a tort." *Infocision Mgmt. Corp. v. Found. for Moral Law, Inc.*, No. 5:08cv1342, 2009 U.S. Dist. LEXIS 65867, at *15 (N.D. Ohio 2009). *See also*

---

[15] In *Hoffman*, property owners brought suit against the seller for fraudulent concealment and negligent misrepresentation for failure to disclose an easement on their property. The seller, in turn, filed a third-party complaint for contribution against the title company for negligently failing to report the easement. The court held that the title company was not a "joint tortfeasor" and therefore could not be held liable for contribution. *Id.* The court explained that "a claim alleging negligence in performing a title search sounds in contract rather than in tort." *Id.* at ¶ 61. Consequently, the contribution claim failed. *Id.* at ¶ 64.

*Telxon* at ¶ 34 ("To hold otherwise would be to convert every unfulfilled contractual promise, i.e., every alleged breach of contract, into a tort claim."). USSA's duty to alert the Dayton Fire Department, if any, arose solely from the alleged contractual relationship with Partners and a separate tort action is not permitted.

Plumbing Defendants argue that USSA owed Partners an independent duty separate and apart from its contractual obligations. "A separate and independent duty is an obligation that the tortfeasor owes to another independent of the contract, that is, a duty which would exist even if no contract existed." *King v. Hertz Corp.*, No. 1:09cv2674, 2011 U.S. Dist. LEXIS 35610, at *6 (N.D. Ohio Mar. 31, 2011). To determine whether a separate and independent duty exists, "a court must look to the 'nature of the grievance rather than the form of the pleading.'" *Id.* Further, "[i]n looking toward the nature of the grievance . . . the breaching party's motive is irrelevant because 'it is no tort to breach a contract, regardless of motive.'" *Id.* at 7. "If the gravamen of the complaint is for breach of contract, the cause of action will not be transformed into one sounding in tort by the charge of tortious conduct or the addition of the adverbs intentionally, willfully, and fraudulently." *Res. Title Agency v. Morreale Real Estate Servs., Inc.*, 314 F. Supp.2d 763, 774 (N.D. Ohio 2004).[16]

---

[16] For example, in *Religious & Charitable Risk Pooling Trust v. Emcor Facilities Servs., Inc.*, No. A1010339, 2011 Ohio Misc. LEXIS 145, at *1 (Ohio App. 2011), a plaintiff's insured entered into an agreement with Sonitrol for the installation and monitoring of a fire alarm system. After an incident in which the alarm was triggered, plaintiff alleged claims for breach of contract and negligence, as a result of Sonitrol's allegedly defective performance. *Id.* at 2. Sonitrol moved to dismiss the tort claims on the ground that its sole duty to plaintiff was contractual. The court agreed and held that "[t]he mere omission to perform a contract

Specifically, plumbing Defendants maintain that even without the express mandate of the Post Orders, Mr. Edwards was independently aware of the risk of damage and injury due to the excessive amount of water that was coming into the freight elevator. Accordingly, Plumbing Defendants argue that harm to Partners was "foreseeable" and that USSA failed to act reasonably. However, whether Mr. Edwards was "independently aware" of the fire risk is immaterial because his duty to act arose solely in contract as it was expressly governed by the Post Orders. If the Court accepted plumbing Defendant's theory, anyone who noticed the leak, including members of the cleaning crew or tenants, had a separate and independent duty to act, or be subject to tort liability.

Finally, plumbing Defendants argue that "a duty arises in every contract that the party perform its obligations with care, skill and faithfulness and the breach of that duty constitutes a tort." *Berger v. Am. Bldg. Inspection, Inc.*, No. 96-2-114, 1997 Ohio App. LEXIS 1794, at *11 (Ohio App. May 2, 1997).[17] Although an "implied duty of good faith exists in every contract . . . it is part of a claim for breach of contract, not a separate tort claim." *Roth v. Nat'l City Bank*, No. C-100216, 2010 Ohio App. LEXIS 4905, at *9 (Ohio App. Dec. 1, 2010). The duty of good faith and fair dealing merely "describes how a party is to perform its contractual obligations, i.e., it does not establish a duty

---

obligation is never a tort unless the omission is also the omission to perform a [separate] legal duty." *Id.* at 4.

[17] In analyzing Ohio law, the U.S. District Court for the Eastern District of Louisiana found that *Berger* was "not an accurate statement of Ohio law." *In Re Educ. Testing*, 517 F.Supp.2d 832, 843 (E.D. La. 2007)).

independent of the contract." *Tarquinio v. Equity Trust Co.*, No. 06CA008913, 2007 Ohio App. LEXIS 3061, at ¶ 14 (Ohio App. June 29, 2007). Therefore, the duty owed under these facts is contractual and does not give rise to a separate tort claim for negligence.

## V. CONCLUSION

Based on the evidence of record, the Court finds that there are no genuine issues of material fact for trial, and that Third-Party Defendant U.S. Security Associates is entitled to judgment as a matter of law on the amended third-party complaint. Therefore, USSA's motion for summary judgment (Doc. 103) is **GRANTED**, and this case is **CLOSED,** upon entry of judgment by the Clerk.

**IT IS SO ORDERED.**

Date: 1/31/2012

Timothy S. Black
United States District Judge